**AVOCENT REDMOND CORP., Plaintiff,**

**v.**

**RARITAN AMERICAS, INC., Defendant.**

No. 10 Civ. 6100(PKC).

United States District Court, S.D. New York.

Feb. 7, 2013.

David James Shaw, Donald Lee Jackson, J. Scott Davidson, James Daniel Berquist, Davidson Berquist Jackson & Gowdey, LLP, Arlington, VA, Paul S. Grossman, Stuart I. Friedman, Friedman & Wittenstein, P.C., New York, NY, for Plaintiff.

Elvin Esteves, Vincent E. McGeary, Gibbons, Del Deo, Dolan, Griffinger and

Vecchione P.C., Newark, NJ, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

P. KEVIN CASTEL, District Judge.

Avocent Redmond Corp. ("Avocent") brought this action against Raritan Americas, Inc. ("Raritan") asserting claims for patent infringement and breach of a licensing agreement. Raritan asserted the affirmative defense of inequitable conduct to Avocent's infringement claims. Avocent moved for summary judgment on the inequitable conduct defense. The Court denied the motion and scheduled a bench trial on this issue alone. *Avocent Redmond Corp. v. Raritan Americas, Inc.,* No. 10 Civ. 6100(PKC), 2012 WL 3114855 (S.D.N.Y. July 31, 2012).

Raritan asserts that Avocent representatives committed inequitable conduct during the prosecution of the relevant patents-in-suit by: (1) concealing the Cybex Litigation Materials during prosecution of U.S. Patent No. 5,884,096 (the "'096 patent"), and (2) withholding the Horiuchi Materials during prosecution of U.S. Patent No. 7,113,978 (the "'978 patent").

This case was tried before the Court without a jury on September 24, 25, and 27, 2012. Each side called witnesses and offered documents into evidence. Thereafter, the Court received post-trial memoranda from the parties. Set forth below are the Court's Findings of Fact and Con-

clusions of Law pursuant to Rule 52(a), FED.R.CIV.P.[1]

The Court concludes that Raritan has not proven, by clear and convincing evidence, that Avocent's omissions during patent prosecution amount to inequitable conduct.

FINDINGS OF FACT

I. *History of the Patents–In–Suit*

Avocent accuses two of Raritan's keyboard-video-mouse ("KVM") switching systems of infringing claim 11 of the '096 patent. Avocent had previously asserted claims of infringement of the '096 patent and four other patents against Raritan in a prior action before this court. *Avocent Redmond Corp. v. Raritan Computer, Inc.,* 01 Civ. 4435(PKC). The prior action was settled on May 12, 2005 in an agreement that granted Raritan a license to use the patented technology (the "Settlement Agreement"). The Settlement Agreement provided that Raritan would make quarterly royalty payments on "Licensed Products" up to a maximum of 5% of Net Reportable Sales but not less than $750,000. (Settlement Agreement ¶ 3.1(c).) The parties also agreed not to sue each other for patent infringement or invalidity during the term of the Settlement Agreement. (*Id.* ¶ 5.1.) After two extensions, the Settlement Agreement expired on August 13, 2010. The next day, Avocent initiated this action.

II. *The Cybex Litigation Materials*

Avocent, the plaintiff in this case, was formerly known as Apex PC Solutions, Inc

---

1. To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice versa. Citations to the Record are not intended to imply that the cited portion represents the only support for the Court's finding.

Citations are abbreviated as follows: Witnesses' declarations are referred to as "[Last

Name] Decl. ¶ ——." Stipulations from the Joint Pre-trial Order are referred to as "PTO Stip. ¶ ——." The trial transcript is referred to as "Trial Tr. at [page]." The plaintiffs' exhibits are referred to as "ATR——" and the defendants' exhibits as "RTR——."

("Apex"). Danny Beasley and his co-inventors were working at Apex when they made the alleged invention claimed in the patents-in-suit. The patents-in-suit are: the '096 patent, the '978 patent, U.S. Patent No. 5,937,176 (the "'176 patent"), U.S. Patent No. 6,112,264 (the "'264 patent"), and U.S. Patent No. 7,818,367 (the "'367 patent"). Avocent owns the patents-in-suit. (PTO Stip. ¶¶ 1, 4, 6–7.)

These patents are all in the same patent family (the "Beasley family"), as each is a continuation patent stemming from U.S. Patent No. 5,721,842 (the "'842 patent"). The '842 patent is not asserted in this case. (PTO Stip. ¶¶ 8, 22–23.)

### A. Timeline of Events

Rodney Tullett, an attorney with the law firm of Christensen O'Connor Johnson Kindness, PLLC, was a patent prosecution attorney for Apex. (PTO Stip. ¶¶ 10, 17.) Mr. Tullett prosecuted the original U.S. patent application in the Beasley family, which issued as the '842 patent on February 24, 1998. (Tullett Decl. ¶ 2; ATR–010.)

In February 1998, after the '842 patent issued, Apex filed suit against Cybex Computer Products ("Cybex") alleging infringement of the '842 patent. (PTO Stip. ¶ 24; Tullett Decl. ¶ 3.) Apex retained Alan Blankenheimer, an attorney with the law firm of Brown and Bain LLP, as lead counsel to represent it in the Apex v. Cybex lawsuit. (PTO Stip. ¶ 9; Saracino Decl. ¶ 3.) Mr. Blankenheimer is not and was not registered to practice before the USPTO. (Blankenheimer Dep. at 21.)

In March 1998, Sam Saracino was hired as general counsel for Apex. Mr. Saracino remained general counsel at Apex, and later Avocent, until he left Avocent in February 2010. Before being hired by Apex, Mr. Saracino was a partner at Davis Wright Tremaine LLP, where he practiced tax, general corporate, and securities law.

(PTO Stip. ¶ 19; Saracino Decl. ¶ 1.) Mr. Saracino never practiced patent law. Mr. Saracino is not and was not registered to practice before the USPTO. (Saracino Decl. ¶ 1.) During his years as general counsel of Apex/Avocent, Mr. Saracino was responsible for dealing with mergers and acquisitions, securities law, general corporate law, corporate governance, and issues relating to customer and supplier contracts. When necessary, Mr. Saracino would assist in the hiring of both patent prosecution counsel and patent litigation counsel. Mr. Saracino did not closely manage or supervise the work of outside counsel, but rather trusted outside counsel to perform their duties adequately. (Saracino Decl. ¶¶ 1–3; see generally Trial Tr. at 467–80.)

Shortly after the Apex v. Cybex lawsuit commenced, in either March or April 1998, Mr. Tullett attended a meeting at Apex with Messrs. Blankenheimer and Saracino, and other individuals working on the litigation. Mr. Tullett's purpose at the meeting was to inform the litigation team of the status of patent prosecution activities involving the Beasley patent family. At the conclusion of Mr. Tullett's portion of the meeting, a member of the litigation team requested that he leave the meeting. (Trial Tr. at 306–08, 312; Tullett Decl. ¶¶ 3–4.)

At the time of this meeting, the '096 patent application was pending in the USPTO. Mr. Tullett had filed the '096 application on November 12, 1997, and prosecuted it until it issued on March 16, 1999. The prosecution of the '096 patent proceeded at the same time as the Apex v. Cybex litigation. (PTO Stip. ¶ 25; ATR–001; Tullett Decl. ¶ 2; Stewart Decl. ¶ 31.)

On November 2, 1998, Andrew Chiu, an associate of Mr. Blankenheimer at Brown and Bain LLP, sent Mr. Tullett a box of

prior art produced in the lawsuit by Cybex and another litigation defendant, Rose Electronics ("Rose"). (Trial Tr. at 320–21; RTR–124.) One reference identified by Cybex and Rose, and provided to Mr. Tullett by Mr. Chiu, was United States Patent No. 5,732,212 to Perholtz (the "Perholtz '212 patent").

On November 12, 1998, Mr. Tullett disclosed all of the prior art from the Cybex litigation to the USPTO on an Information Disclosure Statement ("IDS"). This IDS was filed in the '096 patent application. (Trial Tr. at 321–22; PTO Stip. ¶ 30; RTR–097 at APX 000242.) The Perholtz '212 patent was the first reference among one hundred references listed on the IDS. Mr. Tullett provided credible testimony that he listed this reference first because he believed it was the closest prior art reference cited in the litigation, and he wanted to be sure that the USPTO examiner considered it during the examination of the '096 application. (RTR–097 at APX 000243; Trial Tr. at 328–29.)

On November 13, 1998, the USPTO issued a Notice of Allowance for the claims pending in the '096 application. However, the USPTO examiner handling the '096 application had not yet received the November 12 IDS. Once the examiner received the IDS, he reviewed the material, as is evidenced by his initials next to each item listed on the IDS, including the Perholtz '212 patent. Thereafter, on December 4, 1998, the examiner issued a Supplemental Notice of Allowance for the '096 application, which acknowledged the examiner's consideration of the material disclosed on the November 12 IDS. (PTO Stip. ¶ 31; ATR–013, 014, 15.)

On December 30, 1998, Cybex supplemented its prior interrogatory litigation disclosures and responded to Apex's Interrogatories 15–18. In Cybex's response, Cybex explained its reasons for asserting that the Perholtz '212 patent invalidated Avocent's patent claims. (ATR–075.) This was the first time that Cybex revealed to Apex how it was using the Perholtz '212 patent in the litigation. (See Stewart Decl. ¶ 75.)

By this time, Cybex had acquired the Perholtz '212 patent, and on January 12, 1999, Cybex filed a broadening reissue application for the '212 patent with the USPTO. Cybex attempted to copy claims from the Beasley patents in order to provoke an interference with the Beasley patents. (RTR–018 at APX 433685–433707; RTR–091 at 186476–186619; PTO Stip. ¶ 33.)

Avocent retained Charles Gholz of Oblon, Spivak, McClelland, Maier & Neustadt, LLP ("Oblon") to respond to the potential interference that Cybex sought to provoke. Dr. Michael Casey, another attorney with Oblon, was tasked with assisting Mr. Gholz with issues relating to the potential interference request. (Casey Decl. ¶¶ 7–8; Saracino Decl. ¶ 4.)

On January 21, 1999, Cybex filed a motion for summary judgment of patent invalidity in the *Apex v. Cybex* litigation (the "Anticipation Motion"), asserting that the claims of the '842 patent were invalid over the Perholtz '212 patent. (RTR–007.) In support of this motion, Cybex submitted a declaration by Mr. Robin Anderson (the "Anderson Declaration"), the former President of Fox Network Systems, Inc ("Fox"). Fox was the original owner of the Perholtz '212 patent. The Anderson Declaration, based on Mr. Anderson's personal knowledge of KVM systems, expressed Mr. Anderson's opinion that the claims of the '842 patent were invalid over the Perholtz '212 patent. The Anderson Declaration contained a claim chart and narrative explanation in support of this view. (RTR–007; RTR–018; PTO Stip. ¶¶ 16, 35.)

On February 3, 1999, Cybex filed a Protest at the USPTO which sought to block the issuance of the '096 patent. Cybex suggested that the claims of the '096 application might be interfering with the Perholtz '212 patent, and advised the USPTO to consider the validity of the '096 application. (ATR–016.) In support of this argument, Cybex attached to the Protest (among other things): a copy of the Perholtz '212 patent, (*id.* at APX 433375–433450); product literature for the KVM system manufactured by Fox, (*id.* at APX 433453–433510, 433528–433653); a copy of the Request for Interference filed by Cybex in connection with the '212 reissue application, (*id.* at APX 433685–433707); and the Anderson Declaration, (*id.* at APX 433256–433262).

Along with these materials, Cybex filed a Petition to Waive the Rules (the "Petition"), because Cybex had filed its Protest in an untimely manner under USPTO rules. (*Id.* at APX 433854–433859; *see also* PTO Stip. ¶ 37.) In the Petition, Cybex cited case law confirming the power of the USPTO to withdraw an application just prior to the date of issuance in light of prior art disclosed in a Protest. Cybex attached a copy of this case to the Petition. (ATR–016 at APX 433219; PTO Stip. ¶ 37.)

Cybex served the Protest and Petition on the USPTO Office of Petitions, and hand-delivered a copy to the USPTO group art unit responsible for the '096 patent application. The group art unit acknowledged receipt of the Protest and Petition on February 3, 1999, six weeks before the '096 patent issued on March 16, 1999. (ATR–016 at APX 433863, ATR–080, ATR–001; Casey Decl. ¶ 9; Stewart Decl. ¶ 37.)

On February 17, 1999, the Oblon firm, on behalf of Apex, filed an Opposition to the Petition with the USPTO, noting that Cybex's Protest was filed too late in the process, and that the USPTO had already considered the '212 Perholtz patent. Dr. Casey assisted Mr. Gholz in preparing this Opposition. (ATR–017, 018; Casey Decl. ¶ 12; Stewart Decl. ¶ 39; RTR–036 at OSMMN000954.)

On February 24, 1999, Cybex filed a Reply in support of its Protest and Petition, and hand-delivered this submission to the group art unit responsible for the '096 application. In the interim, Apex and Cybex had agreed to a Stipulated Dismissal of the *Apex v. Cybex* litigation. Cybex attached a copy of this Stipulated Dismissal to the Reply filed with the USPTO. (ATR–019.)

The '096 patent issued on March 16, 1999. (RTR–097 at APX 000110.) Thereafter, the USPTO mailed a Decision denying Cybex's Protest and Petition on the grounds that the '096 patent had already issued, specifically noting that "the aforementioned '212 patent is listed under the 'References Cited' section of the instant issued patent." (ATR–020.)

B. *Apex/Avocent Representatives Did Not Intentionally Withhold the Cybex Litigation Materials during the Prosecution of the '096 Patent.*

 Raritan alleges that Apex/Avocent representatives committed inequitable conduct during the prosecution of the '096 patent by intentionally withholding from the USPTO Cybex's Anticipation Motion, the Anderson Declaration, and the Stipulated Dismissal (collectively, "the Cybex Litigation Materials"). Specifically, Raritan alleges that Messrs. Blankenheimer and Saracino implemented a plan to purposefully deceive the USPTO by withholding the Cybex Litigation Materials, and that Messrs. Tullett and Casey complied with that plan. Based upon the testimony of the witnesses and a review of all the

evidence, the Court finds that these Apex/Avocent representatives did not intentionally withhold the Cybex Litigation Materials.

At trial, Raritan focused on the March or April 1998 meeting at Apex between Messrs. Blankenheimer, Saracino, and Tullett, and the fact that at some point during that meeting, Mr. Tullett was asked to leave. Raritan sought to raise the inference that Mr. Tullett was sent out of the room so that Messrs. Blankenheimer and Saracino could control Mr. Tullett's access to litigation information, with the result that Mr. Tullett would not disclose the litigation information to the USPTO. However, this meeting took place in March or April 1998, one or two months after Apex filed suit against Cybex on February 25, 1998. Cybex did not reveal to Apex how it was using the Perholtz '212 patent in litigation until many months later—December 30, 1998, at the earliest, when Cybex responded to Apex's Interrogatories 15–18. The Cybex Litigation Materials were not provided to Apex representatives until even later: Cybex's Anticipation Motion was filed on January 21, 1999, (RTR–007 at APX 0981997), as was the attached Anderson Declaration, (RTR–018 at APX 433256 *et seq.;* RTR–007 at APX 0981999), while the Stipulated Dismissal was not signed until February 16, 1999 (ATR–019 at APX 000280–000285). Messrs. Blankenheimer and Saracino were not likely aware of the invalidity contentions based on the '212 Perholtz patent until several months after this meeting took place.

In fact, by the time that Cybex first revealed how it was using the Perholtz '212 patent in litigation on December 30, 1998, Mr. Tullett had already received from Mr. Chiu the box of prior art produced in the litigation, which contained the Perholtz '212 patent (RTR–124 at APX 0950944 (dated November 2, 1998)); Mr.

Tullett had already mailed to the USPTO the IDS disclosing (and listing as the first cited reference) the Perholtz '212 patent (RTR–097 at APX 000241–000242 (dated November 12, 1998)); and the USPTO examiner had already issued the Supplemental Notice of Allowance for the '096 patent application, which acknowledged that the examiner had reviewed and considered the Perholtz '212 patent (RTR–097 at APX 000248 (dated December 4, 1998)). This series of events does not give rise to an inference of deceitful intent.

Nor does the exchange of letters between Mr. Blankenheimer and James Berquist, lead outside litigation counsel for Cybex, suggest an intent to deceive. At trial, Raritan argued that Mr. Blankenheimer was put on notice by Mr. Berquist that the Cybex Litigation Materials must be disclosed to the USPTO, because Mr. Berquist wrote to Mr. Blankenheimer expressing his outrage that Mr. Blankenheimer had failed to disclose the significance of the '212 patent to the USPTO. (*See* RTR–003.) Raritan further argued that Mr. Blankenheimer's reply letter to Mr. Berquist confirmed that Mr. Blankenheimer made a deliberate decision to withhold the Cybex Litigation Materials from Mr. Tullett and the USPTO. (*See* RTR–002.)

Viewed in context, the facts do not warrant the conclusion Raritan seeks to draw. Mr. Berquist's letter to Mr. Blankenheimer, dated December 31, 1998, states that Mr. Berquist "was appalled to see the Perholtz '212 patent buried in a November 12, 1998 IDS having more than 100 other references. Given the extreme relevance of this reference, I urge you to advise the Examiner of the pertinence of this reference...." (RTR–003.) Mr. Blankenheimer's reply letter to Mr. Berquist noted correctly that the Perholtz '212 patent was not buried, but was in fact "the *very first*

reference cited to the Examiner." (RTR–002) (original emphasis.)

Mr. Berquist's letter further admonished Mr. Blankenheimer for failing to provide the USPTO with "a copy of the claim chart attached to Cybex's December 30 interrogatory responses." (RTR–003.) The fact that Mr. Blankenheimer's reply to the December 31 Berquist letter did not address the claim chart—which was only transmitted by Cybex one day prior on December 30—does not raise an inference that Mr. Blankenheimer, who was not the prosecuting attorney, made a deliberate decision to withhold material information from the USPTO. The Perholtz '212 patent had been disclosed to the USPTO in a timely and meaningful way, and was, in fact, considered by the examiner.

Finally, Raritan focused at trial on Avocent's privilege log and on invoices sent to Mr. Saracino by Oblon billing Apex for services rendered. Several entries on these documents indicate that throughout the relevant time period, Messrs. Blankenheimer, Saracino, Tullett, and Casey corresponded regarding the prosecution of Apex's patent applications and Cybex's '212 reissue application. Raritan essentially asserts that the existence of some correspondence between these individuals concerning the aforementioned topics raises an inference that the conversations were directed to the deliberate withholding of the Cybex Litigation Materials from the USPTO.

The mere existence of these communications does not support the conclusion that the accused individuals made a deliberate decision to withhold the Cybex Litigation Materials. Rather, the evidence proffered at trial makes clear that Mr. Blankenheimer, through his associate Mr. Chiu at Brown and Bain LLP, promptly sent Mr. Tullett all of the prior art produced by Cybex and Rose during the litigation, and that Mr. Tullett promptly and appropriately disclosed this prior art to the USPTO in the '096 patent application. Mr. Tullett made a deliberate decision to list the Perholtz '212 patent first on the IDS because he thought it was the most relevant prior art produced by the litigation, even though that reference was one of roughly one hundred references produced by Cybex and Rose. This evidence supports the conclusion that Apex/Avocent and its agents did not intend to deceive the USPTO by deliberately depriving it of important information concerning the Perholtz '212 patent.

### III. *The Horiuchi Materials*

By 2000, Avocent had transferred all of its patent prosecution work from Mr. Tullett to Dr. Casey at the Oblon firm. (Casey Decl. ¶¶ 17, 64; Baxter Decl. ¶ 4; Saracino Decl. ¶ 4.) The transferred files included several patent applications, one of which was a Japanese counterpart application to the '842 patent known as Japanese patent number 3412823. Dr. Casey assumed responsibility for this Japanese Patent Office application (the "JPO application") after the file was transferred.[2]

**2.** The Court denies Raritan's motion to strike ATR–109 from the record. ATR–109 is a modified version of the timeline that was used during trial as a demonstrative by Raritan's expert, Nicholas Godici. ATR–109 was offered by Avocent and accepted during trial as a demonstrative in aid of Dr. Casey's testimony. (Trial Tr. at 428.) Raritan's motion to strike rests on the grounds that Dr. Casey never discussed the portions of the demonstrative that were not a part of Mr. Godici's testimony.

However, the record shows that Dr. Casey's testimony extended beyond that offered by Mr. Godici, as Dr. Casey testified at length regarding the errors he found in Mr. Godici's timeline. (*See* Trial Tr. at 404–22.) ATR–109 was thus properly accepted by the Court as demonstrative evidence.

(Casey Decl. ¶ 19; Baxter Decl. ¶ 6; PTO Stip. ¶ 52.)

On April 6, 2004, the JPO issued an official action in the JPO application (the "Japanese Revocation"), rejecting Avocent's proposed claims in light of eleven references, many of them Japanese. One such reference relied upon by the JPO was Japanese patent application JP 05–027721 (the "Horiuchi reference"). On May 13, 2004, the Suzuye & Suzuye firm ("Suzuye"), Oblon's foreign patent agent in Japan, forwarded to the Oblon firm a Japanese language version of the Horiuchi reference, an English abstract of Horiuchi, a partial English translation of Horiuchi, and an English translation of the Japanese Reasons for Revocation (collectively, the "Horiuchi Materials"). (PTO Stip. ¶ 57; Godici Decl. ¶ 19; RTR–025; Trial Tr. at 355, 360–61.)

A. *Dr. Casey Did Not Intentionally Withhold the Horiuchi Materials during the Original Prosecution of the '978 Patent.*

■ In May 2004, United States Patent Application No. 09/683,582 for Avocent (the "'582 application"), which matured into the '978 patent on September 26, 2006, was pending in the USPTO. Dr. Casey had filed the '582 application on January 22, 2002, and was responsible for prosecuting the patent. The '978 patent is a great-great grandchild of the '842 patent. (ATR–007; PTO Stip. ¶ 52.) Raritan alleges that Dr. Casey committed inequitable conduct during the prosecution of the '978 patent by intentionally withholding the Horiuchi Materials.

The Oblon firm received the Suzuye letter and the Horiuchi Materials on May 17, 2004. (Casey Decl. ¶ 20; ATR–028.) At that time, Oblon employed a particular set of procedures for processing, docketing, and responding to foreign office actions in connection with Oblon's foreign patent applications. Oblon established these procedures both to enhance the efficiency with which Oblon prosecuted patent applications for its clients, and to reduce allegations that material prior art was intentionally withheld from the USPTO. (Casey Decl. ¶ 38.) This process began with Oblon's foreign filing department, which was responsible for communicating with foreign associates in connection with foreign applications, and making initial determinations as to how foreign correspondence should be processed within Oblon. (Baxter Decl. ¶ 7; Casey Decl. ¶ 23.)

At trial, the evidence was in conflict as to the procedures that Oblon's foreign filing department followed once it received correspondence from foreign associates, such as Suzuye. The Court heard testimony regarding the procedures from several witnesses. Raritan relied heavily on the testimony of Kathy Swenson, Oblon's Rule 30(b)(6) witness. Avocent relied in part on Ms. Swenson's testimony, and on testimony provided by Dr. Casey and Stephen Baxter, a partner in Oblon's patent prosecution practice who was designated by Oblon to testify at trial.[3] Considering all of

---

3. Raritan moved to strike Mr. Baxter's declaration to the extent his testimony contradicted the deposition testimony of Ms. Swenson, was opinion/expert testimony, or related to subject matter to which Mr. Baxter had no personal knowledge. (Trial Tr. at 437–43.) The Court denies Raritan's motion, and properly considers the testimony of Mr. Baxter, which the Court found credible.

In light of the parties' differing interpretations of Ms. Swenson's testimony, Avocent asked Oblon to provide a trial witness to testify as to the procedures of the firm's foreign filing desk. Oblon designated Mr. Baxter, who had been a partner with that firm for 19 years and was familiar with the relevant procedures. Mr. Baxter's testimony clarified and expounded upon Ms. Swenson's testimony, rather than contradicting it. To the ex-

the testimony and documentary evidence put forth at trial, the Court finds that the relevant procedures followed by Oblon's foreign filing desk in May 2004 were as follows:

1. The foreign filing department was responsible for receiving correspondence from foreign associates.

2. If received correspondence contained any prior art documents or references, the foreign filing department would look at Oblon's internal docketing system (called "OPTMS") to determine if there was a related U.S. patent application pending in the USPTO in which the references should be cited.

3. If the foreign filing department found a related U.S. patent application pending, and the status of that application was that it was not under final rejection:

 a. foreign filing would make a copy of the references and send the copies, along with a Docket Notice indicating a due date for filing an IDS, to an Oblon group called IP Operations;

 b. the IDS Desk, within IP Operations, would then prepare and file an IDS with the USPTO;

 c. the IDS Desk would place a copy of the filed IDS in the U.S. patent application file;

 d. foreign filing would place the original copies of the references into the foreign application file, so that the attorney responsible for prosecuting that particular patent ("the working

attorney") could substantively respond to the foreign office action.

4. Under these circumstances, the IDS Desk, not the working attorney, would be responsible for filing an IDS with the USPTO.

5. If, instead, the foreign filing department found a related U.S. patent application pending, and the status of that application was that it was then under final rejection:

 a. foreign filing would make a copy of the references and send the copies to the working attorney, who would then make a determination as to whether an IDS disclosing the references should or should not be filed with the USPTO;

 b. foreign filing would place the original copies of the references into the foreign application file, so that the working attorney could substantively respond to the foreign office action.

6. Under these circumstances, the working attorney, not the IDS Desk, would be responsible for filing an IDS with the USPTO.

7. The difference existed because if a U.S. patent application was under final rejection, USPTO rules limited the ways in which references could be submitted. Specifically, if an applicant wanted the USPTO to consider new references once an application was under final rejection, the applicant would typically have to file a Request for Continued Examination

---

tent, if any, that their testimonies conflict, the Court finds Mr. Baxter's testimony more credible. Finally, Mr. Baxter properly provided fact testimony, based on his personal experience with the procedures employed by the Oblon foreign filing desk, and not opinion testimony.

As for Raritan's motion to strike the errata sheet to Ms. Swenson's deposition transcript, the Court notes that the errata sheet has not factored into any aspect of the Court's decision on the merits; none of the findings or conclusions set forth herein relies on the errata sheet.

and pay a fee, which would restart the examination process in the USPTO.

8. Finally, if the foreign filing desk received foreign correspondence but determined through searching OPTMS that there was not a pending, related U.S. patent application:

 a. foreign filing would not send references to the IDS Desk or to the working attorney, as there would be no pending U.S. application in which an IDS disclosing the references needed to be filed;

 b. foreign filing would place the references into the foreign application file, so that the working attorney could substantively respond to the foreign office action.

(ATR–071; Baxter Decl. ¶¶ 7–14; Casey Decl. ¶¶ 22–26; Swenson Dep. at 57–59, 173–74, 199–200, 203–07.)

According to this procedure, when the foreign filing department received the Suzuye letter on May 17, 2004, it would have searched OPTMS to determine whether there was a pending, related U.S. application in which to file an IDS disclosing the Horiuchi Materials. Had foreign filing properly determined that there was a pending, corresponding U.S. application—to wit, the '582 application, which matured into the '978 patent—it would have made copies of the attached Horiuchi Materials, docketed an IDS, and forwarded these materials to the IDS Desk, which then would have prepared and filed an IDS with the USPTO. These materials would have been sent to the IDS Desk, and not to the working attorney, Dr. Casey, because the pending U.S. application was not then under final rejection. Therefore, had the foreign filing department properly matched the Suzuye letter and attached materials to the related '582 application, responsibility for filing an IDS disclosing those materials to the USPTO would have fallen on the IDS Desk, not on Dr. Casey.

In this case, however, the foreign filing department failed to determine that there was a pending, related U.S. application. Ample evidence demonstrated the existence of this error. (See, e.g., Swenson Dep. at 204–05, 209–10 (testifying that no IDS had been docketed for the '978 application in 2004); ATR–028 (hand-written notation by foreign filing department on Suzuye letter ("U.S. appln. # 196488US—Granted") referencing the related '842 patent application which had issued six years earlier, but no notation referencing the related and pending '582 patent application); ATR–070 (no docket entry showing "IDS Due" in or around May 2004 in OPTMS records for the '582 application); Trial Tr. at 132 (Raritan expert Mr. Godici testifying that he "do[es]n't recall seeing any evidence that a docket call-up was made").) In light of this error by the foreign filing department, no IDS was docketed, copies of the references were not sent to the IDS Desk, and the IDS Desk did not prepare or file an IDS disclosing the Horiuchi Materials in 2004.

In sum, upon receipt of the Suzuye letter, Oblon's foreign filing department was responsible for finding the pending '582 application and docketing an IDS in light of Horiuchi, and, had the foreign filing department not made an administrative error, the IDS Desk would have been responsible for preparing and filing the IDS with the USPTO. These facts support the inference that in May 2004, Dr. Casey reasonably assumed that the Horiuchi Materials had been properly disclosed in the '582 application. The Court finds that Raritan has failed to prove that Dr. Casey made a deliberate decision to deceive the USPTO.

B. *Dr. Casey Did Not Intentionally Withhold the Horiuchi Materials during the First Reexamination of the '978 Patent.*

█ Raritan further alleges that Dr. Casey committed inequitable conduct by failing to disclose the Horiuchi Materials during the first reexamination of the '978 patent, after having discovered that those materials had not been properly disclosed in May 2004.

In 2007, the JPO issued an office action in a related patent application which caused Dr. Casey to review the contents of the '582 application file. Dr. Casey testified that in August 2007, during his review of the '582 application file, he first discovered the failure to disclose the Horiuchi Materials. (Casey Decl. ¶¶ 32–33.) The '582 application had already issued as the '978 patent one year earlier on September 2006, and it was therefore too late for Dr. Casey to make any filing in that application at that time in order to correct the earlier error. (ATR–007.)

There was, however, another continuation still pending in August 2007, to wit, United States Patent Application No. 11/129,443 (the "'443 application"), which had been filed in May 2005 and later issued on October 19, 2010 as the 7,818,367 patent (the "'367 patent"). (ATR–012). The '443 application was the great-great-great grandchild of the original application for the '842 patent. Accordingly, the '443 application was in the same patent family as the '582 application and the '978 patent. (*Id.;* Casey Decl. ¶ 32.)

On August 6, 2007, Dr. Casey prepared and filed an IDS in the '443 application disclosing to the USPTO all of the Horiuchi Materials. (ATR–057 at Cite Nos. 5–19, 7–3, 10–7, and 11–1.)

At this point in time, Dr. Casey was working for Davidson, Berquist, Jackson & Gowdey LLP ("Davidson Berquist"), having left the Oblon firm in 2005. (Casey Decl. ¶ 33.) Because Davidson Berquist lacked the administrative departments utilized by Oblon, such as the IDS Desk, Dr. Casey had developed an electronic IDS system to help facilitate citing all relevant prior art information to the USPTO. When the firm received references, the IDS database would be queried to determine if those references were already in the database. If the references were not found, they would be added to the database. If multiple related U.S. applications were pending at the same time, they would be linked in the IDS system to ensure that references cited in one application were also properly cited in the others. This system was utilized to help attorneys keep track of what had and had not been cited to the USPTO, particularly in complex cases involving multi-generational patent applications and counterpart foreign patent filings. Moreover, this system, similar to the IDS Desk at Oblon, was utilized in order to reduce allegations that material prior art was intentionally withheld from the USPTO. (Casey Decl. ¶¶ 36–38.)

In late 2007, patent counsel for Rose Electronics, a KVM manufacturer that Avocent had accused of infringing its patents, filed a series of reexamination requests at the USPTO for the '096, '264, and '978 patents. (ATR–002, 005, 008.) Each of these three reexaminations were subsequently linked to each other in Davidson Berquist's IDS system, as all three were related and part of the Beasley patent family. These reexaminations were also linked to the files associated with the original prosecution of the three patents being reexamined, in order to ensure that prior art materials that had been considered during the prosecution of the original patent applications would be resubmitted during the reexaminations. Accordingly, the IDS system collected all of the prior

art cited during the original prosecution of the three patents, and this prior art was disclosed to the USPTO examiner handling the '096, '264, and '978 reexaminations in what Dr. Casey referred to as a "prosecution clean up" IDS. This IDS was filed with the USPTO on February 21, 2008. (*See* ATR–036, 048; Casey Decl. ¶ 39.)

Moreover, around this time, Dr. Casey had learned that Rose Electronics and other manufacturers that Avocent had accused of infringing its patents had identified a large volume of prior art information in connection with litigation pending in Seattle. Dr. Casey asked the paralegal working on that litigation to collect the prior art information produced by the defendants and to add that information to Davidson Berquist's IDS database. The IDS system collected all of this newly added prior art from the Rose litigation, and this prior art was disclosed to the USPTO examiner in what Dr. Casey referred to as a "litigation clean up" IDS. This IDS was filed with the USPTO on February 25, 2008. (*See* ATR–037, 049, 053; Casey Decl. ¶ 40.) Significantly, this IDS disclosed to the USPTO both the Horiuchi reference and the English abstract of Horiuchi supplied by Suzuye in 2004. (ATR–037, 049, 053; Stewart Decl. ¶¶ 6–7.)

Raritan argues that in this February 25, 2008 submission to the USPTO, Dr. Casey intentionally misrepresented the relevance of Horiuchi as coming from "a corresponding litigation by the reexamination requester and/or one of the co-defendants of the reexamination requester," as opposed to coming from the JPO.

The evidence presented at trial does not support this assertion. The Horiuchi reference and the 2004 Suzuye-supplied English abstract were identified in the document productions made by defendants in the Rose litigation, as is evidenced by the fact that both documents are marked with Rose Bates numbers. (ATR–024, 025A; Trial Tr. at 430-31.) Moreover, Horiuchi was one of 674 references cited to the USPTO on February 25, 2008, and there is no evidence that Dr. Casey was even aware that Horiuchi was one of the many references cited that day. (ATR–053; *see also* Casey Decl. ¶ 41.)

Raritan further argues that Dr. Casey, despite having disclosed the Horiuchi reference and the English abstract of Horiuchi on the February 25, 2008 IDS, intended to deceive the USPTO by not disclosing the remainder of the Horiuchi Materials—the 2004 Reasons for Revocation and the Suzuye-supplied partial translation of Horiuchi—until the second reexamination of the '978 patent in January 6, 2010.

The evidence presented at trial does not support the conclusion urged by Raritan. Dr. Casey was credible in testifying that he believed the Reasons for Revocation had already been disclosed during the first reexamination, in the February 21, 2008 "prosecution clean up" IDS. (*See* Casey Decl. ¶¶ 47–50.) Dr. Casey had disclosed to the USPTO all of the Horiuchi Materials, including the 2004 Reasons for Revocation, during the original prosecution of the '367 patent. Because the '367 patent was in the same family as the '096, '264, and '978 applications, the '367 patent should have been linked to those applications in the Davidson Berquist IDS system. Therefore, Dr. Casey reasonably believed that the IDS system collected the information submitted during the '367 patent prosecution, including all of the Horiuchi Materials, when it generated the "prosecution clean up" IDS for the '096, '264, and '978 reexaminations. (*Id.*)

Dr. Casey did not discover that these materials had not been disclosed during the first reexamination until roughly August 12, 2009, one month after the first reexamination closed. (*See* ATR–055 (No-

tice of Intent to Issue Reexamination Certificate issued July 15, 2009); Casey Decl. ¶¶ 47–50.) At that time, Rose accused Dr. Casey of committing inequitable conduct in connection with the prosecution of the '978 patent. (Casey Decl. ¶ 47; PTO Stip. ¶ 75; Trial Tr. at 381.) These allegations, in conjunction with Rose having requested a second round of reexaminations, led Dr. Casey to review which prior art had and had not been cited in the '978 patent prosecution. Dr. Casey discovered in his review of the file that the '367 application had not been properly linked to the pending reexamination applications in the IDS system. Given this linkage error, the IDS program did not properly identify prior art materials cited in the '367 application when generating the "prosecution clean up" IDS. Dr. Casey provided credible testimony that this linkage error was responsible for the failure to disclose the Reasons for Revocation during the first reexamination.[4] (Casey Decl. ¶¶ 47–50; Trial Tr. at 383–84.) Dr. Casey acknowledged that the ultimate responsibility for the error fell on him, but testified that the linkage error was the fault of a paralegal who had entered the data. (Trial Tr. at 383–84.) After the second reexamination of the '978 application was granted by the USPTO on October 9, 2009, Dr. Casey filed an IDS in that application disclosing all of the Horiuchi Materials, including the 2004 Reasons for Revocation, in order to correct the error. (PTO Stip. ¶ 77; RTR–096 at RA01862796–01862817; Casey Decl. ¶ 51.)

These facts support an inference that the Reasons for Revocation were not disclosed during the first reexamination because of administrative error, and possible negligence by Dr. Casey. The Court finds that Raritan has failed to prove that Dr. Casey made a deliberate decision to withhold the Reasons for Revocation from the USPTO.

## CONCLUSIONS OF LAW

### I. *Patent Prosecution Before the USPTO*

 Patent prosecution is an *ex parte* process. The public interest is best served when the USPTO is aware of all information material to patentability. As such, a patent applicant has a duty of candor to the USPTO. This duty is codified in 37 C.F.R. § 1.56(a) as follows:

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability....

This duty applies to anyone who is substantively involved in the patent prosecution. *Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 973 (Fed.Cir.2010). A person is substantively involved if the "involvement relates to the content of the application or decisions related thereto ... [and] is not wholly administrative or secretarial in nature." *Id.* at 974. Violation of the duty of candor constitutes inequitable conduct.

### II. *Inequitable Conduct*

 Inequitable conduct by the patent applicant is a defense to a claim of patent infringement. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed.Cir.2011) (en banc). If patent rights were secured by the inequitable conduct of the patent applicant, or any person substantively involved in the patent

---

**4.** Regarding Raritan's motion to strike ATR–035, the computer printout of the electronic records, the Court notes that this exhibit has not factored into any aspect of the Court's decision on the merits; none of the findings or conclusions set forth herein relies on this exhibit, or on proffered testimony regarding this exhibit.

prosecution, enforcement of the entire patent is barred. *Id.* at 1288. A finding of inequitable conduct can also render unenforceable other related patents and applications in the same family. *Id.* at 1288–89.

■ To prove that a failure to disclose a reference is inequitable conduct, the alleged infringer must show, by clear and convincing evidence, that "the applicant knew of the reference, knew it was material, and made a deliberate decision to withhold it." *Id.* at 1290. Intent cannot be inferred solely from materiality. *Id.*

■ To satisfy the intent requirement, the patent applicant must have misrepresented or omitted material information with the specific intent to deceive the USPTO. *Id.* at 1290. In the case of an omission, the applicant must have made a deliberate decision to withhold a known material reference. *Id.* "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* When relying on circumstantial evidence, the accused infringer must demonstrate that intent to deceive is the "single most reasonable inference able to be drawn from the evidence." *Id.* (citations omitted). Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* (citations omitted) (original emphasis). "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91.

■ In order to prove that an omitted reference is material, the alleged infringer must show, by a preponderance of the evidence, that the USPTO would not have issued a claim had it been aware of the undisclosed prior art, which is commonly referred to as a "but-for" materiality standard. *Id.* at 1291–92. Claims are

to be given their broadest reasonable construction. *Id.* Affirmative acts of egregious misconduct, such as the "filing of an unmistakably false affidavit," also meet the materiality requirement. *Id.* at 1292.

### III. *The Cybex Litigation Materials*

The Court concludes that Raritan has not met its burden of proving by clear and convincing evidence that Messrs. Blankenheimer, Saracino, Tullett, and/or Casey intended to deceive the USPTO. The circumstantial evidence relied upon by Raritan does not raise the inference that any of these individuals acted with the intent to deceive the USPTO during the prosecution of the '096 patent. Certainly, intent to deceive the USPTO is not the "single most reasonable inference able to be drawn from the evidence." *Therasense,* 649 F.3d at 1290.

■ "[M]ateriality and intent are two separate and distinct requirements in a proper inequitable conduct analysis, and both must be shown by clear and convincing evidence." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.,* 695 F.3d 1285, 1294 (Fed.Cir.2012). Raritan has failed to produce clear and convincing evidence that Messrs. Blankenheimer, Saracino, Tullett, and/or Casey made a deliberate decision to withhold the Cybex Litigation Materials with the intent to deceive the USPTO. Thus, Raritan has failed to establish inequitable conduct with regard to the '096 patent. The Court need not and does not consider the materiality of the omitted information.

### IV. *The Horiuchi Materials*

The Court concludes that Raritan has not met its burden of proving by clear and convincing evidence that Dr. Casey intended to deceive the USPTO. Raritan proffered no direct evidence that Dr. Casey intended to deceive the USPTO, but rather

relied exclusively on circumstantial evidence. Therefore, Raritan needed to establish that intent to deceive was the "single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290. Such an inference cannot be drawn here.

While traditional badges of fraud are not essential to a finding of an intent to deceive, their presence or absence may be of help to the trier of fact in deciding the ultimate issues. The Court has searched the record for such badges of fraud by Dr. Casey and has found them lacking. Dr. Casey has no direct financial interest in any of the patent applications he has prosecuted on behalf of his clients, no financial interest in any Avocent patent, and no financial interest in the outcome of this litigation. (*See* Casey Decl. ¶ 4.) No evidence was offered as to Dr. Casey's potential benefit—or detriment—as a lawyer from securing or failing to secure these patents. His role within the two law firms and his potential financial gain or loss was not explored. No evidence was presented as to any particular client or law firm pressure that was exerted on him to secure these patents. No evidence was presented that would suggest Dr. Casey had any motivation to risk his reputation and career by defrauding the USPTO.

Dr. Casey provided credible and reasonable explanations for why the Horiuchi Materials were not properly disclosed to the USPTO until the second reexamination of the '978 patent in January 2010. The most reasonable inference from the evidence is that the Horiuchi Materials were not properly disclosed due to a combination of administrative errors, poor docketing, and negligence on the part of Dr. Casey. The Federal Circuit has made clear, however, that "it is not enough to argue carelessness, lack of attention, poor docketing or cross-referencing, or anything else that might be considered negligent or even grossly negligent." *1st Media, LLC v. Electronic Arts, Inc.*, 694 F.3d 1367, 1374–75 (Fed.Cir.2012); *see also Outside the Box Innovations, LLC*, 695 F.3d at 1292 ("[E]ven gross negligence, is not sufficient to establish deceptive intent."). Rather, "[t]o sustain a charge of inequitable conduct, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *1st Media, LLC*, 694 F.3d at 1375 (citations omitted). Raritan has failed to meet this burden.

Raritan has failed to produce clear and convincing evidence that Dr. Casey made a deliberate decision to withhold the Horiuchi reference with the intent to deceive the USPTO. Thus, Raritan has failed to establish inequitable conduct with regard to the '978 patent. The Court need not and does not consider the materiality of the omitted information.

CONCLUSION

For the reasons set forth above, the Court concludes that neither the '096 patent nor the '978 patent is unenforceable by reason of inequitable conduct.

SO ORDERED.